USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAMMY LEE GOMEZ,

     Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

15-CV-00013 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Pro se plaintiff Tammy Lee Gomez seeks review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI) under the Social Security Act, 42 U.S.C. § 1381, *et seq.* (the Act). Gomez moves pursuant to Fed. R. Civ. P. 12(c) for an order reversing the Commissioner's decision or remanding to a different Administrative Law Judge (ALJ). The Commissioner cross-moves pursuant to Fed. R. Civ. P. 12(c) for an order affirming her decision. The parties have consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, plaintiff's motion is GRANTED in part and this case is REMANDED to the Commissioner for further proceedings.

## I.    BACKGROUND

### A.    Procedural Background

Gomez applied for SSI benefits on March 7, 2011, alleging that she became disabled on January 1, 2009. *See* Cert. Tr. of Record of Proceedings (Dkt. Nos. 12 through 12-11, 21), 111, 208 (hereinafter "R._"). The application was denied on July 27, 2011. (R. 29, 112.) Thereafter, Gomez requested a hearing (R. 131), and on June 4, 2012, she appeared, with counsel, before ALJ Seth Grossman. (R. 131.) On March 18, 2013, Gomez appeared again, with counsel, for a

supplemental hearing before ALJ Grossman. (R. 29, 164.) Dr. Edward Halperin, a psychiatrist, and Dr. Yaakov Taitz, a vocational expert, also appeared at the 2013 hearing. (R. 47.) However, as described in more detail below, the hearing was concluded abruptly, before Dr. Halperin completed his testimony, and Dr. Taitz did not testify at all. (R. 63-73.)

After the 2013 hearing, ALJ Grossman scheduled Gomez for a second consultative psychiatric examination. However, it appears that she never received the appointment letters, which were addressed to an inpatient treatment program from which she had graduated prior to that hearing. (R. 1267-68.) Gomez did not appear for the post-hearing appointment, and on September 17, 2013, the ALJ issued a decision – without the benefit of the second consultative exam or any medical or vocational expert testimony – finding that she was not disabled within the meaning of the Act. (R. 26.) The decision became final on November 6, 2014, when the Appeals Council denied Gomez's request for review. (R. 1.) This action followed.

### B.    Relevant Personal and Medical Background

Gomez was born on April 18, 1968. (R. 208.) She was 42 years old when she applied for SSI benefits in March 2011. She reports suffering from a number of mental and physical ailments, beginning in childhood; however, her March 2011 application for SSI was based solely on her mental impairments. (R. 212.)[1]

Gomez has a sixth-grade education. (R. 49, 278, 484.) As a child she attended a so-called Six Hundred School for children with disciplinary problems. (R. 49.)[2] She testified both that she

---

[1] The administrative record in this case is 1,274 pages long and includes numerous records documenting various physical ailments that are not at issue here. This Opinion and Order summarizes the portions of the record pertaining to plaintiff's mental condition.

[2] "As late as the 1970's, violent and disruptive students were removed from New York City's regular public schools and placed in so-called '600 schools,' where teachers were paid an extra $600 a year for hazardous duty. The schools became dumping grounds for troubled children and were wisely phased out." *Guard Against Dumping-Ground Schools*, N.Y. Times, Sept. 4, 1992,

has "never worked" (R. 77, 101) and that she had not worked in "quite some time." (R. 50.) The record suggests some intermittent prior employment, including work as a cashier (R. 803), a job stacking in a supermarket (R. 830), work at the laundry facility in her drug treatment program in 2012, and a waitressing job at her uncle's business. (R. 30, 787, 790, 1031, 1034, 1195.) Other than working at the laundry, it is unclear from the record when Gomez held any of these jobs. The ALJ found that she had no "past relevant work" for purposes of his disability analysis. (R. 35.)

Gomez has a long history of homelessness, legal troubles, and substance abuse. (*See* R. 258, 315, 1203, 1216.) She has reported ten non-violent misdemeanors (R. 1203) and two felony convictions for drug sales. (R. 278, 1203.) She was incarcerated on several occasions for vagrancy and trespassing. (R. 315.) In addition, she was incarcerated twice in connection with her drug convictions, most recently from 2004 until 2007. (R. 102.) It appears that she was on parole until November or December 2011. (R. 314, 485, 771, 1015.) While incarcerated, Gomez attempted to obtain a G.E.D., but failed. (R. 315.)

Gomez testified that she has used marijuana, heroin, and crack cocaine at various times, and her records show that she also has struggled with alcohol abuse. (R. 53, 766, 1010.) In November 2010, while on parole, Gomez relapsed on drugs and entered Serendipity II (Serendipity), a residential drug rehabilitation and re-entry program, pursuant to a court order. (R. 79, 207, 334.) In August 2011, she began a methadone-to-abstinence residential program (MTAR) at Basics/Promesa Inc. (Promesa), a "health, human services and community development organization" in the Bronx. (R. 314, 732-35.)

---

*available at* http://www.nytimes.com/1992/09/04/opinion/guard-against-dumping-ground-schools.html.

In early 2011, while Gomez was in the Serendipity program, she received medical treatment at the Postgraduate Center for Mental Health (Postgraduate Center). (R. 259-59.) Later that year, while at Promesa, Gomez received treatment at the Clay Avenue Health Center (Clay Avenue). Medical records in Gomez's file, including records from the Postgraduate Center and Clay Avenue, reflect a long-standing diagnosis of bipolar disorder. (*See, e.g.*, R. 258-59, 308, 314, 319, 321.) In addition, Gomez has, at various times, reported suffering from schizophrenia, depression, seizure disorder, and anxiety disorder. (*See, e.g.*, R. 33, 115.) On her SSI application, she listed the conditions that limited her ability to work as schizophrenia, anxiety, seizure disorder, depression, "bi-polar," and "severe depression." (R. 212.) The primary and secondary diagnoses listed on her Disability Determination, however, are Affective Disorder (a term that can encompass both bipolar disorder and major depressive disorder) and Substance Addiction Disorder (alcohol). (R. 111.)[3]

Gomez has been prescribed and has taken numerous medications over the years. On April 11, 2011, shortly after she applied for benefits, her medication regimen included, among other things, Topamax (an anticonvulsant), Neurontin (an anticonvulsant also used to treat neuropathic

---

[3] The regulations as they existed at the time of the Commissioner's decision describe "Affective Disorders" as "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, subpt. P, app'x 1, 12.04 (2013). "Substance Addiction Disorders" are described as "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." 20 C.F.R. Pt. 404, subpt. P, app'x 1, 12.09 (2013). Further, the structure of Listing 12.09 "is different from that for the other mental disorder listings. Listing 12.09 is structured as a reference listing; that is, it will only serve to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances. The listings for mental disorders are so constructed that an individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity." Soc. Sec. Admin., *Program Operations Manual System*, https://secure.ssa.gov/poms.nsf/lnx/0434132005. Therefore, if the requirements for any of the Affective Disorders (12.04) are met, the required level of severity for Substance Addiction Disorder is also satisfied.

pain), and Abilify (an antipsychotic medication used to treat schizophrenia, bipolar disorder, and major depressive disorder). (R. 8.)

### 1.    Treatment at Postgraduate Center for Mental Health (March – April 2011)

On February 4, 2011, Dr. S. Appel, M.D. conducted a psychiatric evaluation of Gomez at the Postgraduate Center. (R. 258-59.) Dr. Appel diagnosed Gomez with bipolar disorder and gave her a Global Assessment of Functioning (GAF) score of 30. (R. 260-63.) [4]

On March 11, 2011, shortly after Gomez filed her SSI application, Dr. Appel saw her again at the Postgraduate Center. (R. 261.) Dr. Appel noted that Gomez reported progress in her rehabilitation program at Serendipity: her therapist had helped her "rephrase" her statements; she had less animosity; and she was better able to stay calm in confrontational situations. (R. 261.) Gomez had two more appointments with Dr. Appel in April 2011. (R. 260, 261.) At both appointments, she indicated that she was making progress in her program. Dr. Appel noted on

---

[4] A GAF score represents a clinician's overall judgment of the patient's level of psychological, social, and occupational functioning. GAF scores range from 1 to 100, with 1 being the lowest level of functioning and 100 the highest. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32-34 (4th ed. rev. 2000). A GAF score of 21 to 30 indicates, "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 34. A score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.* A score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51-60 signifies "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *Id.* Scores in the 60's and higher indicate symptoms that are "mild," "transient," "minimal," or "absent." *Id.*

April 15, 2011 that Gomez's affect was intense and her thinking was circumstantial. However, her mood was somewhat improved, to the point where she was "unstable, but manageable." (R. 260.)

### 2.    Consultative Psychiatric Evaluation by Dr. Michelle Bornstein (May 27, 2011)

On May 27, 2011, Michelle Bornstein, Psy.D. conducted a consultative psychiatric examination in connection with Gomez's SSI application. (R. 278.) Gomez was "cooperative" during the evaluation. (R. 279.) Dr. Bornstein observed that plaintiff was "unkempt and poorly groomed," but her eye contact was "appropriate," she "spoke fluently in a clear voice," and her "expressive and receptive languages were adequate." *Id.* Her manner of relating, social skills, and overall presentation were "adequate." *Id*. Although Dr. Bornstein found Gomez's affect to be mildly dysphoric and her mood mildly dysthymic, she described Gomez's thought processes as "[c]oherent and goal directed," and her sensorium was clear. *Id.* Dr. Bornstein found that Gomez's recent and remote memory skills were intact, but her attention and concentration were mildly impaired, and her cognitive functioning was "[e]stimated to fall in the low average range." (R. 280.) Dr. Bornstein deemed Gomez's insight and judgment "fair." (R. 280.) Gomez told Dr. Bornstein that she could not work because of mental illness, including "anger issues." (R. 278.)

Based on her consultative examination, Dr. Bornstein concluded that Gomez "can dress, bathe, groom, cook, clean, do laundry, shop, manage her money, and take public transportation." (R. 280.) Dr. Bornstein also opined that Gomez "can follow and understand simple directions and instructions, and perform simple tasks independently. She has some difficulty maintaining attention and concentration. She can maintain a regular schedule and learn new tasks. She may need supervision performing complex tasks. She can make appropriate decisions, relate adequately with others, and appropriately deal with stress." *Id.* It is not clear on what basis Dr. Bornstein evaluated Gomez's ability to "relate adequately with others." Dr. Bornstein's diagnosis was

depressive disorder, opiate dependence in early stages of remission, and cocaine abuse in remission. *Id.*

### 3. Woodhull Medical and Mental Health Center (May 31 – June 23, 2011)

On May 31, 2011, four days after Dr. Bornstein conducted her evaluation, Gomez was involuntarily admitted to Woodhull Medical and Mental Health Center (Woodhull) as the result of an incident of "impulsive/unpredictable behavior." (R. 331, 356, 358, 360, 369, 480, 481.) The precise nature of the incident is unclear from the record, but there are indications that Gomez was not fully compliant with her medication and behaved aggressively, and possibly violently, at Serendipity. (R. 482, 486, 489, 545.) Gomez remained hospitalized at Woodhull for approximately three and a half weeks, until June 23, 2011. (R. 724, 334.) While there she was medicated and attended group and individual therapy. (R. 402, 536, 539.)

Throughout her hospitalization, Gomez was under "intensive observation" by nurses and other staff, who kept notes on her behavior. (*See e.g.*, R. 530, 531, 553.) The notes reveal that Gomez was often calm, cooperative, and neat, but also had outbursts of agitation and bizarre or aggressive behavior. (R. 569-702.) For example, on June 11, 2011, Gomez was "screaming, banging the doors, banging on the counter," and "not listening" to verbal intervention efforts by the staff. (R. 624.) She was given an injection of Lorezepam (an anti-anxiety drug) and Haldol (an anti-psychotic). *Id.* By June 17, Gomez showed "steady improvement," but was still "tangential and unpredictable at times." (R. 343.) She frequently failed to attend group classes or therapy sessions, or left within a few minutes of arriving. (*See* R. 645, 647.) On June 23, 2011, Gomez was discharged to Serendipity. (R. 672, 724, 334.) A discharge form by Dr. Michel D. Joseph, M.D. and social worker Carmen Robles shows that her GAF score was assessed at 50. (R. 334.)

### 4.      Consultative Review by Dr. Robert F. Lopez
### (June 21, 2011)

On June 21, 2011, while Gomez was still at Woodhull, Dr. Robert F. Lopez, a state agency psychologist, completed a Psychiatric Review Technique Form (PRTF), which is a "standard document" typically completed by a medical or psychological consultant. *Petrie v. Astrue*, 412 Fed. App'x 401, 408 (2d Cir. 2011). The questions on the form are the same questions that must be considered at the second and third steps of the ALJ's sequential analysis for determining disability (*see infra* at pp. 21-23).

Dr. Lopez did not meet or evaluate Gomez in person. He completed the PRTF based on the medical records available to him, including Dr. Bornstein's consultative report. There is no indication that Dr. Lopez reviewed Gomez's records from Woodhull or was even aware, at the time he completed his report, that Gomez was an involuntary psychiatric inpatient.

In considering Gomez's potential mental disorders, Dr. Lopez addressed the criteria for Affective Disorders (Listing 12.04) and Substance Addiction Disorders (Listing 12.09). (R. 283.) He did not consider whether she met the criteria for any other disorders, such as Schizophrenia (Listing 12.03) or Anxiety-Related Disorders (Listing 12.06). *Id.* With regard to Affective Disorders, Dr. Lopez checked the box for a single symptom: "sleep disturbance." (R. 286.) The PRTF made no note of any other symptom of any other mental disorder. Moving on to the so-called "paragraph B" criteria (*see infra* at pp. 22-23), Dr. Lopez found that Gomez experienced "mild" restriction in in her activities of daily living; "moderate" difficulties in maintaining social functioning; "mild" difficulties in maintaining concentration, persistence, or pace; and had experienced "one or two episodes" of "deterioration, each of extended duration." (R. 293.) Dr. Lopez concluded that Gomez's impairments did not meet or medically equal Listings 12.04 or

12.09. Similarly, Dr. Lopez checked a box indicating that Gomez did not meet the "paragraph C" criteria. (R. 294.)[5]

Although Dr. Lopez found that Gomez was "not significantly limited" with respect to most of the subcategories in the assessment, he concluded that she was "moderately limited" in certain subcategories, including her ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently. (R. 297-98.)

Dr. Lopez also conducted a mental residual functional capacity (RFC) assessment. (R. 297-301.) "Residual functional capacity" refers to "the most [claimant] can still do despite [claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The assessment required Dr. Lopez to rate Gomez's degree of limitation in four categories of mental activity: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Each category, in turn, contains various subcategories, for a total of 20. (R. 297-98.) With regard to each of the 20 subcategories, Dr. Lopez found that Gomez was "not significantly limited" or was "moderately" limited. He did not find her "markedly" limited in any subcategory. Nor did he indicate that he had insufficient evidence to rate Gomez in any of the 20 subcategories. *Id*. Dr. Lopez concluded that Gomez's allegation of difficulty functioning due to bipolar disorder was "credible, but not to the degree

---

[5] Dr. Lopez did *not* check the box indicating a "medically documented history" of schizophrenic or affective disorder of at least two years' duration "that has caused more than a minimal limitation of ability to do any basic work activity." (R. 294.) Nor did he check the box marked "insufficient evidence to establish the presence of the 'C' criteria," which would have required further explanation. *Id*.

alleged." (R. 299.) In particular, Dr. Lopez questioned Dr. Bornstein's statement that Gomez "has some difficulty maintaining attention and concentration," commenting that Bornstein's statement was "based on a one time evaluation and is not consistent with the findings of the mental status examination that she performed." (R. 299.)[6] Ultimately, Dr. Lopez concluded that Gomez was "capable of following supervision, relating appropriately to coworkers, and performing substantial gainful activity (SGA), though she "may be precluded from performing tasks requiring a high degree of stress and/or complexity." *Id.*

### 5.   Treatment at Clay Avenue
### (August 22, 2011 – June 26, 2012)

On August 22, 2011, approximately one month after she was discharged from Woodhull, Gomez was admitted to Promesa for MTAR. (R. 356, 732, 976.) The intake notes reflect that Gomez was "[c]alm and cooperative," felt well, and had "no complaints." (R. 732, 976.) A psychiatric note, also dated August 22, 2011, stated that Gomez was "oriented to time, place, person, and situation," that she had "normal insight" and "normal judgment," and that she exhibited "appropriate mood and affect." (R. 734, 978.)

On October 14, 2011, Gomez met with Dr. Kingsley Nwokeji, M.D., an attending psychiatrist at Clay Avenue. Dr. Nwokeji became Gomez's treating psychiatrist while she was in the Promesa program. (R. 747, 991.) Gomez presented on October 14 with "mood swings." (R. 747, 991.) Dr. Nwokeji's notes reflect that Gomez had been "non-compliant with medications" in the past, though she was then compliant. (R. 745, 746, 989, 990.) Dr. Nwokeji evaluated Gomez's mental status, noting:

> The patient is not exhibiting signs of psychosis. No signs of mania. Patient's appearance is appropriate. Patient is oriented to person, place, time and situation. Behavior is described as unremarkable. Speech is clear. Patient's

---

[6] It is not clear what inconsistency Dr. Lopez perceived. As he noted, Dr. Bornstein's mental status exam found that the claimant's "[a]ttention and concentration were mildly impaired." (R. 299.)

affect is appropriate. Patient's mood is euthymic. Memory is intact. Sensorium is clear consciousness. Patient's intellect is average. Attitude is cooperative. Attention is gained. Reasoning is fair. Impulse control is fair. Judgment is fair. Insight is fair. Patient's self-perception is realistic. Thought processes are logical. Thought content is unremarkable. The patient does not express suicidal ideation. The patient does not express homicidal ideation.

(R. 746, 990.) Dr. Nwokeji diagnosed bipolar disorder, assessed a GAF score of 40, and continued Gomez's medications. (R. 746, 990.)

On November 11, 2011, Gomez had a follow-up appointment with Dr. Nwokeji. (R. 753, 997.) She reported no complaints and stated that she was compliant with her medications. (R. 753, 997.) Dr. Nwokeji noted that Gomez exhibited "[m]oderate improvement" in responding to medications. (R. 754, 998.) The report on her mental status was mostly unchanged. Dr. Nwokeji added only that her "[p]sychomotor behaviors are unremarkable." (R. 754, 998.)

Beginning in early December 2011, Gomez attended weekly individual therapy sessions with Gustavo A. Checa, a licensed master social worker, at Clay Avenue. (*See, e.g.*, R. 761-62.) On intake, Checa assessed a GAF score of 50. (R. 766-68, 1012.) Gomez reported to Checa that she had been drinking more than five glasses of beer per day as recently as the previous month. (R. 766.) She also reported her past drug abuse, including snorting heroin until July 2, 2011. Checa's mental status evaluation from his first session with Gomez reports that she displayed agitated behavior, hyperactive psychomotor behavior, pressured speech, anxious mood, tangential thought processes, and obsessive thought content. (R. 767.) Gomez told Checa that in order to handle anger she took showers, took her medication, went to sleep, or read a book. In order to handle sadness she cried. *Id.* Checa's notes from various therapy sessions from January 2012 to May 2012 reveal that Gomez increasingly reported "anxiety" as her chief complaint (*see, e.g*., R. 893, 907, 910, 940); she and Checa discussed, among other things, Gomez's progress at Promesa

11

(*see, e.g.*, R. 787, 790, 893, 904), her difficulties with a roommate (R. 888), and her attempts to locate housing outside of Promesa. (R. 888, 907, 910, 940.)[7]

At Clay Avenue, Gomez was also seen occasionally by nurse practitioner (NP) Briana Morrison. (*See, e.g.*, R. 773-76.) On December 16, 2011, when Gomez presented with depression, Morrison stated that her "[r]elated symptoms are fairly controlled," and there was "improvement of initial symptoms," and that the patient's GAF score was 45. (R. 773, 1017.) Gomez told Morrison that her functioning was "somewhat difficult," but she denied any presenting symptoms or aggravating factors, and she reported her medication to be "therapeutic and tolerable." (R. 773, 1017.) Gomez was compliant with her medication at that time; her medication response was noted as "[s]ymptoms resolved." (R. 774, 1018.)

Gomez next saw her treating psychiatrist, Dr. Nwokeji, on January 13, 2012. (R. 793, 1037.) Dr. Nwokeji noted that Gomez was compliant with her medications and that there had been moderate improvement in her medication response. (R. 794, 1038.) Gomez denied experiencing any side effects from her medications. (R. 794, 1038.) Dr. Nwokeji's mental status report dated January 13, 2012 remained unchanged from his prior reports. (R. 794, 1038.)

That same day, Dr. Nwokeji completed a Medical Source Statement for Gomez in connection with her pending SSI application. (R. 308.) In the Medical Source Statement, Dr. Nwokeji stated that he had first seen Gomez on September 16, 2011 at the Clay Avenue mental health clinic, and monthly thereafter *Id.*[8] Dr. Nwokeji listed Gomez's symptoms as mood swings,

---

[7] Under the regulations in effect at the time of the ALJ's decision, licensed social workers are not "acceptable medical sources" for purposes of establishing an impairment under 20 C.F.R. § 404.1513(a) (2013). However, the opinions of social workers are "important and should be evaluated on key issues such as impairment severity and functional effects." *Maldonado v. Berryhill*, 2017 WL 946329, at *24 (S.D.N.Y. Mar. 10, 2017) (quoting Social Security Ruling (SSR) 06-03p, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006)).

[8] The Court has not seen any records of the September 16, 2011 appointment.

poor sleep, poor appetite, and command auditory hallucinations. (R. 308.)[9] Gomez's mood was depressed, and her affect was labile (indicating rapid shifts in outward emotional expressions), but she denied any suicidal or homicidal ideation. *Id*. Dr. Nwokeji assessed her insight, judgment, and impulse control as "fair." *Id*. He concluded that Gomez's GAF score was 45 and that her impairments lasted, or could be expected to last, at least twelve months. (R. 309.)

As part of the Medical Source Statement, Dr. Nwokeji checked boxes to indicate that Gomez's mental abilities were "poor" with respect to every category concerning her ability to make an occupation adjustment; every category concerning her ability to make a performance adjustment; and every category concerning her ability to make a personal-social adjustment. (R. 310-12.) However, asked to identify the factors that supported his assessment or any other work-related activities that would be affected by Gomez's impairment, Dr. Nwokeji left those sections of the form blank. *Id.* He did check a box to indicate that Gomez could manage benefits in her own best interest. (R. 312.)

On February 16, 2012, Gomez presented to Dr. Nwokeji with mood swings. (R. 1055.) She reported that she had "no complaints," that she was compliant with her medications, and that she had not experienced any side effects from her medications. *Id.* Dr. Nwokeji noted "[m]oderate improvement" with respect to Gomez's response to medication, and her mental status report remained unchanged. (R. 1056-57.)

---

[9] "Command auditory hallucinations are auditory hallucinations that instruct a patient to act in specific ways; these commands can range in seriousness from innocuous to life-threatening." Keith Hersh & Randy Borum, *Command Hallucinations, Compliance, and Risk Assessment*, 26 J. Am. Acad. Psychiatry L. 353, 353 (1998).

On March 1, 2012, Dr. Nwokeji completed a "psychiatric summary" of Gomez, which set forth unremarkable findings concerning her mental status, including "[f]riendly affect and good mood." (R. 321.) Her GAF score remained unchanged at 45. *Id.*

On April 12, 2012, Dr. Nwokeji completed another "psychiatric summary," in which he described Gomez's presenting problem as:

> [A] long History of Dysphoria with persistent sadness, insomnia, social withdrawal, Anhedonia, poor impulse control, religious pre-occupation, anxiety and associated vague Auditory Hallucinations with ideas of reference which lasts for 2 to 3 weeks at a time. She also describes occasions of persistent irritable mood with pressured speech, "flight of ideas" and increased energy which last between 3 to 5 days. She is being followed for medication management monthly and weekly psychotherapy.

(R. 319.) Dr. Nwokeji also noted that Gomez "has been unable to function without medications." (R. 320.) The mental status report was generally unremarkable. (R. 319.)

On April 20, 2012, shortly after her application for supportive housing was conditionally approved by the New York City Human Resources Administration (NYC HRA), Gomez was admitted to the St. Barnabas Hospital Emergency Department with a panic attack. She was discharged later that day. (R. 323-24, 328, 1080.)

On May 9, 2012, Gomez met with NP Esther Aguirre at Clay Avenue for "standard medication management." Gomez presented as "extremely anxious, tearful, [and] agitated." (R. 1090.) Ultimately, however, she "agree[d] to refrain from harmful action," and she was "able to descale," and "went back to MTAR." (R. 1092-93.) Two days later, on May 11, 2012, Gomez reported to her social worker, Checa, that she was going to a "3/4 housing" in two weeks and that her plan was to move into "supportive housing" eventually. (R. 1095.) It is unclear from the record whether these moves ever occurred. On May 29, 2012, Gomez saw NP Aguirre, reported feeling "less agitated," and stated that her medication was helping. (R. 1104.)

On August 13, 2012, Gomez again saw NP Aguirre for medication management. (R. 1238.) The notes state that Gomez had "graduated" from MTAR the previous month and that she was in the "Narco Freedom" substance abuse and treatment program. (R. 1238.) Gomez reported that she was feeling "less agitated" but was starting to get panic attacks, and that her doctor was not helping. *Id.* Her mental status report remained generally unremarkable; however, NP Aguirre noted that Gomez's "[t]hought content reveals paranoia." (R. 1241.) Gomez agreed to continue her current medications and NP Aguirre recommended therapy. (R. 1242.)

### 6.     Treatment at FEGS (November – December 2012)

In November and December 2012 Gomez was evaluated at the Institute for Family Health through Federation Employment and Guidance Services (FEGS). (R. 1194, 1214.)[10] It appears that her initial evaluation, on December 4, 2012, was conducted by Dr. Artur Mushyakov, M.D. (R. 1194.) The results of the evaluation are contained in a FEGS Biopsychosocial Report (BPS Report), which states that Gomez's last auditory hallucinations were in May 2011; that she had traveled independently to her FEGS appointment by subway, but was unable to travel during rush hours because of a history of head injury; and that she spent her days seeking housing. (R. 1222.) Gomez received a score of 14 on a Patient Health Questionnaire for depression (PHQ-9), which indicated "moderate" depression. (R. 1206, 1223.) With respect to her daily activities, Gomez reported that she was able to wash dishes and clothes, sweep/mop, vacuum, make beds, shop for groceries, cook meals, get dressed, bathe, and use the toilet. (R. 1223.)

---

[10] FEGS was a New York City program that provided "assistance [for] applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits." *Morales v. Colvin*, 2015 WL 2137776, at *7 n.16 (S.D.N.Y. May 4, 2015).

The BPS Report also noted that Gomez "became tearful" during her evaluation, reporting that "her lack of stable housing for 12 years or longer [was] devastating" and that she "feels often overwhelmed with all of her appointments and lack of assistance." (R. 1223.) Dr. Mushyakov referred her for a psychiatric examination for anxiety and schizophrenia. (R. 1194.)

On December 19, 2012, Gomez saw Dr. John Lohrasbi for the psychiatric examination. (R. 1197.) She unable to elaborate on certain aspects of her personal and medical history, (R. 1195), and was "evasive" regarding her drug use. The report indicates that Gomez may have used drugs the previous month. *Id.* With respect to Gomez's functional impairment, Dr. Lohrasbi stated that her ability to follow work rules, accept supervision, deal with the public, maintain attention, relate to co-workers, adapt to change, and adapt to stressful situations were all "severely impaired." (R. 1195-96.) Gomez was assessed a GAF score of 45, and diagnosed with Opioid Dependence and Mood Disorder. (R. 1196.) Her "wellness plan" included outpatient psychotherapy rehabilitation, antipsychotic medication, and methadone substance abuse treatment. *Id.*

## II.      HEARINGS

### A.      June 4, 2012 ALJ Hearing

At the June 4, 2012 hearing, the ALJ and Gomez's counsel both questioned Gomez directly. At the time, plaintiff was still an inpatient at Promesa. She testified that she had never worked; that she was at Promesa because she "caught a nervous breakdown," which she attempted to "medicate with a bag of dope," causing her to overdose. (R. 77-79.) She explained that she was seeing a psychiatrist "about four times a week" and was on methadone. (R. 77.) Asked about her other medications, Gomez listed Neurontin, Topamax, Risperdal (an antipsychotic used to treat both bipolar disorder and schizophrenia), Abilify, and Motrin. (R. 83.) Gomez told the ALJ that she could not work, in part because she had "too many panic attacks, anxiety attacks." (R. 80.) "I don't know, my nerves are really shot out. That's why I can't work." *Id.* Gomez recalled being

hospitalized at Woodhull for a "mental relapse" in June 2011 (R. 82), and also reported being at Montefiore Hospital "[j]ust recently," because she "had an incident." (R. 86.)[11]

Asked if she got into fights a lot, Gomez explained, "I don't get into fights, but like I get hysterical and my nerves get really bad and I got to run to like a counselor or a psych because they tease me about my – they tease me, you know what I'm saying, like they'll tease me. They know, you know, it'll hit my trigger." (R. 89.) When asked who teased her, Gomez expressed anger at a "girl in my room," explaining that "I wound up in the hospital the other day because of her." (R. 91.) During this portion of her testimony Gomez became so worked up that the ALJ and her attorney asked her to calm down, offered her water and a break, and noted that she was "crying during this hearing." (R. 90-92.) Gomez elected to continue, explaining that she went through "a lot of crying spells. It's just part of me, you know what I mean. And I suffer from depression or I'm just either [sic] too emotional. I don't know what the hell is going on, but I cry. I just cry. I just can't, you know, like I can't help it." (R. 92.) Gomez continued, "I just have to cry because if I hold it in, I'll scream to the top of my head and I'll scare the whole building. That's when they really hospitalize me, when I hold s--- in." *Id.*

Asked about the effect of her medications, Gomez said that they helped calm her down, in conjunction with other techniques, such as taking showers and distracting herself with a movie or a book. (R. 92-93.) Gomez took four or five showers every day, "[b]ecause my medications, they're not like strong enough." (R. 93.) The cold water helped her calm down and "freshen[ed] me up for like two or three hours" before she had to "run back in the shower." (R. 94.) The

---

[11] The ALJ issued a subpoena requesting all of Gomez's medical records from Montefiore Medical Center, dated June 12, 2012. (R. 795.) In a response dated June 20, 2012, Montefiore asserted that "[t]horough searches of our files indicate that we have no record of the requested information." (R. 794.) Although Gomez testified that she was at "Montefiore," she may have been referring to her treatment at St. Barnabas on April 20, 2012.

medications also had side effects, including side pain, cottonmouth, and feeling "super tired" in the morning. (R. 93.)

**B.      March 18, 2013 Supplemental Hearing**

On March 18, 2013, after obtaining additional medical records, the ALJ held a supplemental hearing. Dr. Halperin was present to testify as a medical expert and Dr. Taitz was present to testify as a vocational expert. By this time Gomez had "graduated" from Promesa and was attending a "Narco Freedom" methadone maintenance program as an outpatient. (R. 67-69.)

Gomez testified that she attended school through the sixth grade and was in "special ed" at a Six Hundred School. (R. 49.) She told the ALJ she had not worked in the last 15 years, had been suffering from depression since she was a child, and realized at around the age of 20 that she needed "a little bit of help here for my mental, mental hospital you know, mental, mental doctors here, and I've been trying to learn since you know, here and there, you know, how you balance this, this – ." (R. 52-53.) ALJ Grossman asked about her past drug use, which Gomez freely admitted. (R. 53-54.) The ALJ then challenged her:

Q.      How would I know that you're not taking drugs now?

A.      How would you know?

Q.      How would I know?

A.      How wouldn't I know that you didn't take, your, diploma for this, right?

(R. 54.) After commenting that he could "probably produce my diploma," *id.*, ALJ Grossman turned to Dr. Halperin and asked him when Gomez last took drugs. (R. 55.) Dr. Halperin could not answer. *Id.*

Gomez told the ALJ that she lived in a shelter, "in a little room," and also stayed "with friends" because she was "not trying to be homeless." (R. 58.) When the ALJ asked if she could work, Gomez said, "[a]bsolutely not," but when pressed could not "get specific right now." (R.

59.) In response to further questioning she elaborated: "Yeah, I don't, yeah I don't want to. I, I just don't even have the slightest idea of how to cope with people. I can't deal with them." (R. 59-60.)

The ALJ then turned back to Dr. Halperin and asked, "[D]o you have any idea if she's on something now, Doctor"? (R. 60.) Dr. Halperin said he thought she was "but I don't know what, and I wouldn't speculate." *Id*. Gomez asked what it was they saw, "[o]ther than my methadone?" *Id*. Dr. Halperin told her that when she arrived she was "nodding out like you were on heroine [sic]," but that a few minutes later "you acted like you were high or your [sic] were on cocaine." (R. 61.) This apparently angered Gomez. Although the record does not reflect her movements, it does reflect her attorney saying, "Whoa, whoa, whoa, whoa, whoa, sit back, sit back," and the ALJ telling her to sit down and calling for "Eric," apparently a security guard, who arrived a moment later. (R. 61-62.) There is no indication in the record that Gomez made actual physical contact with any of the hearing participants or that the guard was required to take any action.

The ALJ once again turned to Dr. Halperin, and asked if Gomez was capable of working. The medical expert replied, "No, no, well, but the, record suggests the person is incapable of working, okay." (R. 62.) Dr. Halperin added that "there should be some ongoing urine tests that should be from Promesa whoever is giving the methadone maintenance thing, and I see no rush to determine whether she's capable of working or not capable of working." (R. 63.)[12] After asking Dr. Halperin (again) whether he could "tell if she's on," and after Dr. Halperin explained (again) that he could not, *id.*, the ALJ adjourned the hearing (R. 64), saying he would reconvene it after obtaining updated medical records and sending Gomez for a second consultative psychiatric exam.

---

[12] As noted above, Gomez was no longer at Promesa. She reminded the ALJ of that a few minutes later, on the record. (R. 67.)

(R. 64-73.) Dr. Taitz, the vocational expert, was never called to testify, and Dr. Halperin never completed his testimony.

### C.      Post-Hearing Requests for Additional Consultative Examinations

At the ALJ's request, Gomez was scheduled for a second consultative psychiatric examination on July 8, 2013. (R. 1268.) The Social Security Administration (SSA) mailed a letter dated June 19, 2013 to Gomez at her Promesa address – where she no longer resided – informing her of the appointment. (R. 1267.) It also mailed a letter to her attorney (R. 1268), who asserts that he never received it. Pl. Reply Br. (Dkt. No. 24), at 1-2. The letters warned that if Gomez failed to appear or failed to provide a reason for her absence, the ALJ would render a decision on the basis of the existing record. Gomez failed to appear.

The consultative examination was then rescheduled for July 31, 2013, and a letter dated July 22, 2013 was again mailed to Gomez, at her old Promesa address, and to her counsel, who asserts that he never received it. Pl. Reply Br. at 1-2. The July 22 letters recited the new date and reiterated that if Gomez failed to appear, the ALJ would make a decision based on the existing record. (R. 1269-70.) Again, Gomez failed to appear. The ALJ issued his decision on September 17, 2013, without the benefit of any post-hearing psychiatric examination, and without any expert medical or vocational testimony. (R. 26-36.)

## III.    APPLICABLE LAW

A claimant is "disabled" within the meaning of § 1614(a)(3)(A) of the Act, and thus entitled to SSI benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairment, or combination of impairments, must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

In evaluating disability claims, the Commissioner must apply the five-step process set forth in 20 C.F.R. § 416.920(a)(4)(i)-(v). The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation need not progress to the next step. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof as to the first four steps; however, the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national economy that the claimant could perform, given the claimant's RFC, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.912(f) (2012), 416.960(c).

The relevant regulations, as they existed at the time of the Commissioner's decision, provide further guidance for evaluating whether a mental impairment meets or equals a listed impairment under the third step. In a "complex and highly individualized process," 20 C.F.R. § 416.920a(c)(1) (2011), the ALJ must determine how the impairment "interferes with [the

claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2) (2011). The main categories assessed are the claimant's:

> (1) activities of daily living;
>
> (2) social functioning;
>
> (3) concentration, persistence, or pace; and
>
> (4) episodes of decompensation.

20 C.F.R. § 416.920a(c)(3) (2011). The first three categories are rated on a five-point scale from "none," through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4) (2011). A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(C) (2013). The last category – episodes of decompensation – is rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4) (2011).[13]

With respect to listed mental disorders, including affective disorders, a claimant must also show that she meets the so-called "paragraph B criteria" or "paragraph C criteria." The paragraph B criteria require at least two of the following:

> (1) "marked" restriction of activities of daily living;
>
> (2) "marked" difficulties in maintaining social functioning;
>
> (3) "marked" difficulties in maintaining concentration, persistence, or pace; or

---

[13] As of January 17, 2017, the text of 20 C.F.R. § 416.920a(c)(3) and (c)(4) has been amended. The Commissioner now rates a claimant across "four broad functional areas," considering her ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 416.920a (c)(3). In this Opinion and Order the Court applies the regulations as they existed at the time of the Commissioner's decision.

(4) repeated episodes of decompensation.

20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B) (2013).[14]

The paragraph C criteria require any one of the following:

(1) repeated episodes of decompensation, each for extended duration;

(2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

(3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C) (2013). If even one of the paragraph C criteria is present, the ALJ must find the claimant to be disabled.

If the mental disorder does not meet the paragraph B or paragraph C criteria, it may still qualify as a disability if the claimant's RFC does not allow her to perform the requirements of her past relevant work, or if the claimant's limitations, age, education, and work experience dictate that she cannot be expected to do any other work in the national economy. 20 C.F.R. § 416.920(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 416.920(e), 416.945(a)(3). If the claimant's RFC does not allow her to perform her past relevant work, the evaluation progresses to the next step.

Finally, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do, given

---

[14] As of January 17, 2017, the text of 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04 has also been amended. In this Opinion and Order the Court applies the regulations as they existed at the time of the Commissioner's decision.

her RFC. 20 C.F.R. § 416.960(c)(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, app'x 2, typically guide this evaluation, placing claimants with exertional (physical) limitations into categories according to their RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(f). However, "[w]hen a claimant suffers from a nonexertional limitation such that he is 'unable to perform the full range of employment indicated by the [Grid],' or the Grid fails 'to describe the full extent of a claimant's physical limitations,' the Commissioner must introduce the testimony of a vocational expert in order to prove 'that jobs exist in the economy which claimant can obtain and perform.'" *Rivera v. Colvin*, 2015 WL 1027163, at *11 (S.D.N.Y. Mar. 9, 2015) (quoting *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005) and *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)).

## IV.    ALJ'S DECISION

In his September 17, 2013 written decision, ALJ Grossman correctly set out the five-step sequential evaluation process described above. At step one, the ALJ found that Gomez had not engaged in substantial gainful activity since filing her SSI application. (R. 31.) Neither party disputes this conclusion. At step two, the ALJ found that Gomez suffered from "severe" impairments, including depression and substance abuse disorder. *Id.* Again, neither party disputes this conclusion.

At step three, the ALJ found that Gomez's impairments did not meet or medically equal the severity of either of the relevant Listings, which he identified as 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders). (R. 31.) In assessing the paragraph B criteria, the ALJ found that Gomez has only "mild" restrictions in activities of daily living, "moderate" restrictions in social functioning, and "mild" difficulties with regard to concentration, persistence, or pace. (R. 32.) In reaching these conclusions, the ALJ relied primarily on the opinion of Dr. Lopez, which he

characterized as "consistent with the record as a whole." *Id.* With regard to Gomez's social functioning, the ALJ commented that she "was able to function in a drug treatment program." *Id*. In fact, Gomez was involuntarily admitted to a psychiatric hospital for three and half weeks while attending that drug treatment program.

The ALJ acknowledged that Gomez had "one to two" episodes of decompensation, each of extended duration, but concluded, on the basis of Dr. Bornstein's report, that those episodes were insufficient to satisfy paragraph B because they "were not relevant to the timeframe in question, her SSI application filing date and later." (R. 32.) In fact, Gomez was hospitalized twice *during* the relevant time period: once for three and a half weeks at Woodhull, as noted above, and once briefly, for a panic attack, at St. Barnabas. The ALJ had the treatment notes for both hospitalizations but failed to acknowledge them in connection with his paragraph B analysis.

The ALJ also found that the paragraph C criteria were not met. He concluded, without citing to any particular portions of the record, that Gomez "has not had repeated episodes of decompensation or a residual disease process, or an inability to function outside a highly supportive environment." (R. 32.) In fact, Gomez had been in the "highly supportive environment" of a residential drug treatment program (Promesa) from August 2011 to July 2012, but still suffered episodes of "decompensation" requiring hospitalization. The ALJ did not mention these facts.

ALJ Grossman next concluded, based on "the entire record," that Gomez had the RFC to perform a full range of work subject to the following nonexertional limitations: simple instructions and task work. (R. 33.) He also found that Gomez was able to concentrate and maintain attention within "normal standards," and could maintain "a normal schedule." *Id.* To determine Gomez's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as

"opinion evidence." *Id*. He correctly set forth the two-step analysis for assessing a claimant's symptoms: at step one, the ALJ determines whether there is "an underlying medically acceptable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms." *Id*. At step two, the ALJ "determine[s] the extent to which [the symptoms] limit the claimant's functioning." *Id.* "For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.*

The ALJ summarized the claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms as set forth in her disability report, completed in connection with her SSI application – where she alleged that her disability was due to schizophrenia, anxiety disorder, depression, and bipolar disorder – and in the FEGS report, which stated that "her barrier to being employed was because [sic] she felt isolated, depressed, and sad, stressed, cried often, had memory problems, and insomnia." (R. 33.)

The ALJ found that there was an underlying medically determinable mental impairment that could reasonably be expected to produce Gomez's symptoms. (R. 35.) However, at step two, he found that Gomez's allegations were "not entirely credible" because the "objective medical evidence, specifically the treating notes, fail to corroborate the severity" of the allegations. *Id*. In support of this conclusion, the ALJ first cited to Gomez's PHQ-9 questionnaire (indicating that she was only "moderately" depressed that day) and one page of treatment notes from Woodhull stating that Gomez was "calm" that day. (R. 33.). He did not discuss the claimant's testimony at either of the hearings before him, except to the extent she acknowledged past drug use and a

criminal record. As to those facts, the ALJ relied on them heavily, calling them "objective findings" that "fail to provide strong support" for Gomez's allegations:

> The claimant was admitted to Postgraduate . . . for substance abuse treatment. Examination notes show that the claimant had multiple arrests, which would explain her poor earnings record. She also testified to partaking in illicit drugs such as heroin and crack cocaine. The record shows that she is currently on parole after being involved in the sale of drugs.

*Id*. Other than his suggestion that her arrests might "explain her poor earnings record," the ALJ did not explain why plaintiff's criminal record undercuts her claim of disabling mental illness.[15]

With respect to the opinion evidence concerning the RFC, the ALJ gave "great weight" to the opinion of consultative reviewer Dr. Lopez that Gomez was "not more than moderately impaired in any functional area" (R. 34), stating that his opinion was "consistent with the medical evidence of record as a whole" and with Gomez's activities of daily living. *Id*. The ALJ either did not notice or did not mention that Dr. Lopez was unaware, when he provided his opinion, that Gomez was an involuntary inpatient at Woodhull. Nor did Dr. Lopez have any of her treatment notes from Clay Avenue.

The ALJ also gave "great weight" to the opinion of consultative examiner Dr. Bornstein, because it too was "consistent with the medical evidence of record as a whole" and with "treatment notes that show that the claimant was able to maintain her activities of daily living on or off illicit substances. She has used substances for a longitudinal period and has been able to cope." (R. 34.) No actual treatment notes were cited. In fact, Dr. Bornstein – like Dr. Lopez – reviewed a substantially incomplete record, and saw Gomez shortly before she was involuntarily committed to Woodhull.

---

[15] The fact that a claimant has a criminal record or is on parole does not, standing alone, undermine her credibility. *See, e.g.*, *Lussier v. Colvin*, 2014 WL 3928456, at *9-10 (W.D.N.Y. Aug. 12, 2014). Moreover, Gomez was not "currently" on parole, and had not been since 2011. (*See, e.g.*, R. 314.)

In contrast, the ALJ gave "little weight" to Dr. Nwokeji's Medical Source Statement, finding that it was undermined in part by Dr. Nwokeji's own treatment notes and was inconsistent with Gomez's activities of daily living. (R. 35.) He also found that Dr. Nwokeji's assessment of Gomez's GAF score at 45 was "a mere snapshot of the claimant's ability to function at the particular time of the assessment and cannot be afforded significant weight." *Id.* In particular, the ALJ stated, Dr. Nwokeji's assessment of Gomez as unable to follow even simple instructions was inconsistent with his view that she could manage her money if awarded benefits. *Id*. Thus, the ALJ concluded, "[t]he objective medical evidence, specifically the treating notes, fail to corroborate the severity of the claimant's allegations." *Id*.

> Before moving on to step five, the ALJ stated, in bold, underlined text:
> The claimant was informed that she needed to attend a post-hearing psychiatric consultative examination but she did not attend, which detracts significantly from her credibility . . . . Although I did consider the entire record in reaching my decision, despite the claimant's non-attendance, I included the non-attendance as a significant factor when considering claimant's overall credibility.

*Id*. (record citations omitted). The ALJ did not address whether Gomez received the consultative examination appointment notice – which appears unlikely, since it was sent to an address where she no longer resided. Nor did he consider whether (assuming she received the notice) her failure to attend might be better viewed as evidence supporting her psychiatric disability rather than evidence undercutting her credibility.

Finally, in this section of his opinion, the ALJ recounted Dr. Halperin's testimony at the 2013 hearing, which he summarized as follows:

> [Dr. Halperin] could not answer the question as to if [sic] drug abuse was material in this case. Dr. Halperin indicated that the claimant's performance indicates that the claimant's demeanor at the hearing showed that she might be under the influence of substances but he would not confirm that. Dr. Halperin testified that he was unable to render a fair opinion at the present time.

(R. 35.) It is not clear why the ALJ included Dr. Halperin's wholly *inconclusive* testimony concerning claimant's *possible* drug use, particularly given that he made no effort to resolve the issue. Nor is it obvious why ALJ Grossman quoted only this portion of Dr. Halperin's testimony, without mentioning (a) that Dr. Halperin was called as a medical expert but never completed the testimony he was there to provide, or (b) that before the hearing was adjourned Dr. Halperin began that testimony by stating, under oath, that Gomez was likely "incapable of working." (R. 62.) Rather, the ALJ once again returned to the topic of plaintiff's criminal past, stating that she "engaged in the selling of substances, which indicates that she is capable of work-like activity. Furthermore, she is able to perform her activities of daily living with no problems. She has managed to function for thirty years on substances according to the record." (R. 35.) The ALJ did not mention plaintiff's struggles with homelessness or difficulty functioning even within the highly supportive environments of Serendipity and Promesa.

At no point during his step four analysis did the ALJ cite any portion of Gomez's testimony, at either hearing, concerning her symptoms or her functional abilities. (R. 33-35.)

At step five, the ALJ found that Gomez had no past relevant work. However, he concluded that, in light of her age (42 when she applied for benefits), education (limited, but she could communicate in English), lack of work experience, and RFC, there were jobs existing in significant numbers that Gomez could perform. (R. 36.) He did not identify any specific job or job category, nor cite the testimony of any vocational expert, but he noted that Gomez's nonexertional limitations (which he identified as a limitation to "simple instructions and task work") "have little or no effect on the occupational base of unskilled work at all exertional levels." *Id.* The ALJ concluded that "[a] finding of 'not disabled' is therefore appropriate under the framework of

section 204.00 in the Medical-Vocational Guidelines," which, he explained, apply where a claimant has "solely non-exertional limitations." *Id.*

## V.    ANALYSIS

"This Court may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Plaintiff argues that the ALJ erred by giving insufficient weight to the opinion of plaintiff's treating psychiatrist, Dr. Nwokeji, giving too much weight to the assessments of the consultative examiner and reviewer, Dr. Bornstein and Dr. Lopez, and failing to consult a vocational expert at step five. *See* Pl. Mem. of Law (Dkt. No. 16) at 1, 8, 12. Plaintiff also notes that the ALJ made a number of factual errors, indicating that he "did not accurately review the records in this case," thus implicitly arguing that the Commissioner's decision is not supported by substantial evidence. *Id.* at 9. The Court cannot fault the ALJ for discounting Dr. Nwokeji's opinion, which lacked internal support and was inconsistent, at least to some degree, with his own treating notes. However, the numerous factual errors in the ALJ's decision – together with his selective citation of the record and his failure to acknowledge substantial contrary evidence – undermines his uncritical acceptance of the non-treating consultants' opinions and weighs in favor of a remand. In addition, as discussed below, the ALJ erred by failing to provide any reasoning with regard to the paragraph C analysis and failing to obtain any expert vocational testimony.

### A.    Non-Trivial Factual Errors

"While factual determinations are within the ALJ's competence, these determinations must be manifestly informed by the evidence." *Melendez v. Astrue*, 630 F. Supp. 2d 308, 315 (S.D.N.Y. 2009) (citing *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004)). If the ALJ commits "factual errors in evaluating the medical evidence," his decision denying benefits "is not

supported by substantial evidence." *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996); *see also Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009) (where the ALJ's credibility determination is based largely on factual errors, "we cannot say that it is supported by substantial evidence"); *Edel v. Astrue*, 2009 WL 890667, at *15 (N.D.N.Y. Mar. 30, 2009) (ALJ's finding is "not supported by substantial evidence where [the ALJ] relied primarily upon a misstatement of the record"); *Wilson v. Colvin*, 2016 WL 5661973, at *9 (W.D.N.Y. Oct. 3, 2016) (internal quotations omitted) ("although the ALJ provided 'specific' reasons for discounting Plaintiff's credibility, the Court cannot find that they were 'legitimate' reasons because they are based on a misconstruction of the record"). While "[o]ne or two factual inaccuracies may amount to harmless error," *Chandler v. Soc. Sec. Admin.*, 2013 WL 2482612, at * 8 (D. Vt. June 10, 2013), numerous errors, particularly regarding matters upon which the ALJ relied, require remand. *Id.*

In this case, as noted above, the ALJ mischaracterized Gomez's hospitalization history at step three, inaccurately stating that she experienced no episodes of decompensation after she filed her SSI application and that she "was able to function" in her drug treatment program (R. 32), when in fact she was involuntarily hospitalized, for an extended episode of decompensation, while in that program. The Court is also troubled by the following errors, omissions, and mischaracterizations:

- The ALJ never mentioned the 2012 hearing at which Gomez testified.

- Although the ALJ stated that he "considered all testimony" (R. 35), he did not cite to any of Gomez's testimony at the 2013 hearing. He never mentioned her inability to "cope with people," which she explained at both hearings (R. 59, 89-91), or the frequent "panic attacks" to which she testified in 2012 (R. 80-83, 86-94), although her testimony was consistent with various treatment notes in the record.

- The ALJ stated that vocational expert Dr. Taitz "testif[ied]" at the 2013 hearing, which did not happen. (R. 29.)

- The ALJ stated that Gomez was "currently on parole after being involved in the sale of drugs," citing Dr. Bornstein's May 2011 report. (R. 33.) In fact, Gomez's parole ended long before either hearing. (*See, e.g.*, R. 314, 770-71.)

- The ALJ mischaracterized Dr. Nwokeji's treatment notes when he wrote, "Dr. Nwokeji noted that when the claimant was medicated and partaking in psychotherapy, she was able to function." (R. 35, citing Ex. 15F at 3.) Dr. Nwokeji's note actually stated that Gomez "has been unable to function without medications" and "is currently being maintained on medications and weekly psychotherapy." (R. 320.)

- The ALJ asserted that the opinions of Dr. Bornstein and Dr. Lopez were entitled to "great weight," in part because they were consistent with the "record as a whole" (R. 32), without noting that substantial evidence was added to the record *after* Dr. Bornstein and Dr. Lopez completed their work. Moreover, that additional evidence – including records of Gomez's hospitalization at Woodhull, Checa's treatment notes from Clay Avenue, and the FEGS BPS Report – was largely *inconsistent* with the reports of these two non-treating doctors.[16]

- The ALJ relied on testimony from Dr. Halperin – concerning Gomez's possible drug use – that the witness himself expressed no confidence in, while omitting Dr. Halperin's far more relevant testimony that the "record suggests the person is incapable of working." (R. 62.)

- The ALJ relied heavily on Gomez's failure to attend a post-hearing consultative examination, without acknowledging that the notices informing her of the appointments were mailed to her at Promesa – even though, as she testified during the 2013 hearing, she was no longer in the Promesa program.[17]

- The ALJ dismissed the GAF score contained in Dr. Nwokeji's Medical Source Statement as "a mere snapshot of the claimant's ability to function at the particular

---

[16] As noted above, Checa was a social worker rather than a medical doctor, but his opinions are "important" and "should be evaluated on key issues." *Maldonado*, 2017 WL 946329, at *24. Moreover, the ALJ did not merely disregard Checa's opinions; he also ignored Checa's extensive treatment notes, which furnish objective evidence of Gomez's mental impairments and were clearly inconsistent, in several respects, with the opinions of Dr. Bornstein and Dr. Lopez. Consequently, it was also error for the ALJ to conclude – without considering the Woodhull treatment notes, the Checa treatment notes, and the BPS Report – that the opinions of the consultative examiners were consistent with the "record as a whole."

[17] As noted above, the letters were also addressed to Gomez in the care of her lawyer, who now states he never received them. The Court is not in a position to resolve this factual issue.

time of the assessment" (R. 35), without noting that it was one of a series of low GAF scores assigned by a variety of mental health professionals.[18]

- According to the ALJ, Dr. Nwokeji's opinion that Gomez was "capable" of managing her SSI benefits, should they be awarded, was "inconsistent" with his opinion that Gomez "could not even follow simple instructions." (R. 35.) No explanation or authority is cited for the proposition that these findings are "inconsistent," and the Court has been unable to locate any.

These errors are not "harmless." *See Melendez*, 630 F. Supp. 2d at 317 (declining to remand where ALJ's factual errors were harmless). Rather, as in *Chandler*, "the ALJ made numerous factual errors," some of which were significant to his conclusion, and "all of which – taken together – require remand." 2013 WL 2482612, at * 8.

## B.   Selective Citation of the Record

To determine whether the findings of an ALJ are supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). An ALJ may not take a selective view of the record in order to support his conclusion. *See Harris v. Colvin*, 149 F. Supp. 3d 435, 447 (W.D.N.Y. 2016). Thus, remand may

---

[18] The use of GAF scores was discontinued in the current edition of the DSM, known as the DSM-V, which was published in 2013. Also in 2013, the SSA issued a bulletin limiting the use of GAF scores in disability proceedings, noting that "there is no way to standardize measurement and evaluation." SSA Message 13066, July 22, 2013. *See Gonzalez v. Colvin*, 2015 WL 1514972, at *18 (S.D.N.Y. Apr. 1, 2015) (a GAF score is simply a form of "opinion evidence"); *Mainella v. Colvin*, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (same). Standing alone, therefore, ALJ Grossman's decision to discount the GAF score assigned by Dr. Nwokeji – on the ground that it was inconsistent with his treating notes – was unobjectionable. However, the ALJ failed even to acknowledge a series of similarly low GAF scores assessed by other treating professionals during the relevant time frame, much less explain his rejection of that entire body of opinion evidence. (*See, e.g.*, R. 260-63 (GAF score of 30 from Dr. Appel in February 2011), R. 766-68 (GAF score of 50 from LMSW Checa in December 2011), R. 334 (GAF score of 50 from Woodhull physicians in June 2011)).

be warranted where an ALJ fails to mention "parts of the record which contradict his conclusion." *Sutherland*, 322 F. Supp. at 290; *see also Melendez*, 630 F. Supp. 2d at 315 (quoting *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984)) ("It is grounds for remand 'when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him.'").

In this case, the ALJ was improperly selective in reviewing and discussing Gomez's medical records. For example, the ALJ stated that "[t]reatment notes from Woodhull . . . revealed that the claimant was in control of her moods and behavior and was calm." (R. 33, citing Ex. 19F at 240.) The citation is to a treatment note recorded by a social worker on the third day of Gomez's extended hospitalization at Woodhull. While the ALJ's description of that particular treatment note is accurate, the cited note is not representative of Gomez's behavior throughout her hospitalization, let alone typical of her status more generally. A Woodhull treatment note from June 11, 2011 – just days later – reflects that Gomez was "screaming, banging the doors, banging on the counter, not listening to verbal intervention[,] threatening staff [and] spiting [sic] saliva on staff." (R. 624.) The ALJ did not mention that note, nor that the Woodhull staff had to administer additional medication, by injection, before plaintiff could control her behavior. *Id.*

Similarly, the ALJ relied on the fact that Gomez's affect, insight, attention span, and concentration were all "normal" even during an "abnormal examination" in which Gomez was agitated and anxious. (R. 34, citing Ex. 23F at 53.) The "abnormal examination" on which the ALJ relies occurred on May 8, 2012, when Gomez presented to NP Patricia Giurleo with a toothache and skin lesion. (R. 933.) In this instance, again, the ALJ did not mischaracterize that particular record; however, he ignored the many pages of treatment notes demonstrating that Gomez's mental status examinations were not typically "normal." For example, one day later, on May 9, 2012,

Gomez presented to NP Aguirre as "extremely anxious, tearful, [and] agitated." (R. 1090.) Her attention was "gained," and her reasoning, impulse control, judgment, and insight were all only "fair." (R. 1092.) The May 9 examination also documented Gomez's sleeping problems, tremors, hyperactive motor behaviors, pressured speech, and anxious, irritable, and depressed mood, and showed that her thought content revealed "obsessions." *Id.*

The ALJ implicitly recognized, in his opinion, that no one note can demonstrate whether plaintiff's "mental status examination was within normal limits over a longitudinal period of time." (R. 34.) Yet he only cites one additional note for this proposition: an April 17, 2012 note, recorded by NP Aguirre (R. 922), which was also *atypical* in the context of Gomez's stay at Promesa. Moreover, none of the findings in the April 17 mental status examination were "normal." *Id.* That examination revealed that Gomez was agitated, experiencing tremors and hyperactivity, had "pressured, loud and excessive speech," and displayed a constricted affect, an irritable and depressed mood, and circumstantial thought processes. *Id.* Her reasoning was "poor," and her impulse control, judgment, and insight were all only "fair." *Id.* Three days later, on April 20, 2012, Gomez was admitted to St. Barnabas with a panic attack. (R. 328, 1080.)

The ALJ's selective citation to the treatment record also implicates the treating physician rule, which generally requires the ALJ to give controlling weight to the opinion of a claimant's treating physician, as long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). One of the reasons for the rule is the recognition that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports

of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*; *accord Mongeur*, 722 F.2d at 1039 n.2.

Where mental health treatment is at issue, the "longitudinal picture" takes on added significance. *Rodriguez v. Astrue,* 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009). "A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015). By selectively quoting from the treating notes that reflect only a patient's "good days," an ALJ undermines the treating physician rule and commits legal error. The ALJ's selective treatment of the record also supports remand.

### C.    Paragraph C Criteria

Remand may also be warranted where "the ALJ offered no meaningful analysis in his decision whatsoever regarding the paragraph (C) criteria." *Bohn v. Comm'r of Soc. Sec.*, 2012 WL 1048607, at *10 (N.D.N.Y. Mar. 5, 2012), *report and recommendation adopted*, 2012 WL 1048867 (N.D.N.Y. Mar. 28, 2012); *see also Rivera*, 2015 WL 1027163, at *13 (remanding where "the ALJ simply concluded that plaintiff did not meet the Paragraph C Criteria of Listing 12.04 without any assessment of the pertinent criteria"). Indeed, in *Berry v. Schweiker,* 675 F.2d 464 (2d Cir. 1982), after searching for and finding sufficient credible evidence in the record to support the rejection of a listed impairment, the Court of Appeals noted that "[c]ases may arise . . . in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record," and instructed the Secretary, in future cases, to "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Id*. at 469. Thus, "[e]ven where the hearing officer's

ultimate conclusion is potentially supportable, the Court ought not affirm a decision where there is a reasonable basis for doubting whether the appropriate legal standards were applied." *Aregano v. Astrue*, 882 F. Supp. 2d 306, 320 (N.D.N.Y. 2012) (remanding where the ALJ failed to discuss whether the record evidence supported the criteria for Listing 12.02(C)).

With respect to Listing 12.04, the paragraph C criteria are (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C) (2013). The presence of any one of these criteria directs a finding that a claimant is disabled. Here, the ALJ summarily dismissed the possibility that Gomez satisfied any of the paragraph C criteria:

> The undersigned considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant does not meet the "C" requirement under listing 12.04 as she has not had repeated episodes of decompensation, or a residual disease process, or an inability to function outside a highly supportive environment.

(R. 32.) "With respect to the last factor . . . the ALJ provides no explanation for his conclusion, which is inconsistent with certain evidence in the record." *Rivera*, 2015 WL 1027163, at *3. Here, the evidence demonstrates that Gomez spent nearly two years in highly-structured residential drug treatment programs, where, according to treatment notes, she still required frequent "redirection" from staff and relied on counselors at the facility to help her handle her roommate. (R. 89-90.) During the same period, despite the structure provided by the programs, she was hospitalized twice for more intense treatment. The record also shows that in April 2012, Gomez was conditionally

approved by the NYC HRA for "Community Care and Level II supportive housing for individuals with serious mental illnesses." (R. 323-34.) The NYC HRA found that the following services would be "required" for Gomez: "[t]he structure and support of a Mental Health Day Treatment Program, a continuing Treatment Program, or other relevant mental health program[;] Treatment and counseling for alcohol and/or substance dependence[;] Ongoing medical treatment for medical condition(s)[;] Ongoing psychiatric treatment[; and] On-site case management services." (R. 324.)

While these facts do not necessarily demonstrate that Gomez satisfies the third paragraph C criterion, it is unclear from the face of the decision whether the ALJ even considered them. "The facts here are not so clear as to render the ALJ's analysis of this third criterion unnecessary." *Rivera*, 2015 WL 1027163, at *13. The ALJ's cursory treatment of the paragraph C criteria therefore warrants remand.

### D.    Vocational Expert

The ALJ failed to obtain any expert vocational testimony at the fifth step of his analysis, notwithstanding his determination that Gomez had nonexertional limitations.[19] As noted above, the Commissioner bears the burden of proof at the fifth step. *See Reyes v. Colvin*, 2015 WL 337483, at *15 (S.D.N.Y. Jan. 26, 2015) (remanding based on ALJ's failure to obtain opinion of vocational expert at step five). To satisfy this burden, the Commissioner must show that the claimant has the RFC to perform substantial gainful activity in the national economy. *See Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citing *Schaal*, 134 F.3d at 501), *report and recommendation adopted*, 2012 WL 6621722 (Dec. 19, 2012).

---

[19] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. § 416.969a(c).

"Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava*, 2012 WL 6621731, at *18 (citing *Acevedo v. Astrue*, 2012 WL 4377323 (S.D.N.Y. Sept. 4, 2012) and *Giannasca v. Astrue*, 2011 WL 4445141 (S.D.N.Y. Sept. 26, 2011)). On the other hand, if the ALJ properly concludes that the non-exertional limitations "do not significantly limit the claimant's ability to do work," then "a vocational expert is unnecessary." *Reyes*, 2015 WL 337483, at *15.

In this case, the ALJ called a vocational expert to testify at the 2013 hearing, but failed to obtain any opinion from that expert (whether by testimony or interrogatory). Instead, he concluded – apparently independently – that Gomez's mental limitations "have little or no effect on the occupational base of unskilled work at all exertional levels." (R. 36.) Thus, in order to determine whether the ALJ erred by failing to obtain expert vocational testimony, the Court "must determine whether there is substantial evidence in the record to support [his] conclusion." *Reyes*, 2015 WL 337483, at *15 (citing *Acevedo*, 2012 WL 4377323, at *14); *see also Lacava*, 2012 WL 6621731, at *18 (citing *Cotto v. Astrue*, 2012 WL 2512054, at *7 (S.D.N.Y. June 28, 2012)) (finding that the ALJ erred by failing to "consult a vocational expert . . . presumably because he had already concluded that [plaintiff's] mental limitations had 'little or no effect on the occupational base of unskilled work'").

A nonexertional limitation "significantly" limits the range of work if it is "non-negligible," *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), meaning that it "so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Selian*, 708 F.3d at 421 (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)). In determining whether a claimant's mental impairments "significantly" limit her range of work, the ALJ "must not assume

that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." SSR 85-15, 1985 WL 56857, at *4 (SSA Jan. 1, 1985). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.*

Insofar as the ALJ's written decision reveals, he relied primarily on the opinion of consultative reviewer Lopez for his conclusion that Gomez's mental limitations had "little or no effect" on the range of work she could perform. (R. 32-33.) This was error. As noted above, Dr. Lopez's opinion was itself based on incomplete evidence. The evidence that Dr. Lopez did not see – but that was available to the ALJ – was in many respects inconsistent with the consultative reviewer's conclusion that Gomez had only "moderate" limitations in the area of social functioning and only "mild" limitations regarding concentration, persistence, or pace. An employee who can calm her panic attacks only by taking four to five showers a day, and who has had difficulty modulating her interactions with other people even in a highly structured inpatient program, may face more than "negligible" limitations in her range of work, notwithstanding that "she was able to perform simple calculations and counting." (R. 32.)

Even if the ALJ was justified in adopting Dr. Lopez's conclusions as to Gomez's limitations wholesale, her "moderate" limitations in social functioning "required the ALJ to find that the plaintiff's range of potential employment was significantly limited." *Baldwin v. Astrue*, 2009 WL 4931363, at *27 (S.D.N.Y. Dec. 21, 2009); *see also Zwick v. Apfel*, 1998 WL 426800, at *8 (S.D.N.Y. July 27, 1998) ("moderate" limitations in activities of daily living and social

functioning "cannot be said to result in only a 'negligible' loss of work capacity") (internal quotations and citations omitted). "While the presence of non-exertional limitations does not always require the use of a vocational expert," *Reyes*, 2015 WL 337483, at *16, in this case – as in *Reyes* – "there is a substantial amount of evidence of significant limitations," *id*., making it "unreasonable" to allow the ALJ to conclude that Gomez's limitations "have little or no effect" on her employability for "unskilled work at all exertional levels." (R. 36.) Since the ALJ's conclusion was unsupported by substantial evidence, his failure to obtain expert vocational opinion also requires a remand.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's motion is DENIED, plaintiff's motion is GRANTED in part, and this proceeding is REMANDED to the Commissioner for further proceedings consistent with this Opinion and Order. The Court leaves the decision whether to remand to a different ALJ to the Commissioner. *See Valentin v. Colvin*, 2017 WL 923903, at *4 (D. Conn. Mar. 8, 2017); *Sutherland*, 322 F. Supp. 2d at 292.

Dated: New York, New York
       March 30, 2017

**SO ORDERED**.

_____
**BARBARA MOSES**
**United States Magistrate Judge**